Good morning and welcome to the Ninth Circuit. Before we begin, Judge Bennett and I would like to welcome and thank Judge Silver who's sitting here today with us by designation from Arizona. Thank you for coming. Welcome. We're very glad to have you. One case came off calendar and that is Carruth v. Ustler with a deferred submission. All four remaining cases will be argued, the first of which, I'm not sure to pronounce it correctly, Mickel v. Unum Group. When you're ready. If I may reserve three minutes. Okay. May it please the court. Counsel, Brian King is my name. I have the honor with John Wood of representing Mr. Mickel. There's a threshold issue in this case, Your Honor, that is important and that's the standard of review. This is a Rule 52 proceeding. The district court handled it in that manner and there is a dispute between the parties as to whether the de novo standard of review applies to this case or whether it's a clear error standard of review. As you know from the briefing, our position is that it should be de novo and the reason for that is that in these ERISA benefit denial cases, the review is limited to, in most cases, not always, not invariably, but in most situations, and this is one of them, the review from both the district court and the Court of Appeals is limited to the pre-litigation appeal record and that's what we have here. Consequently, and this is something that the district court expressed some frustration over, he, Judge Brian said, I'd like to see what happens in the crucible of cross-examination, to quote him, but he was a little frustrated that he was dealing with just a cold of course. There have to be separate findings and conclusions set forth and those findings, when they are based on credibility evaluations, are deferred to. They're only reversed when there is clear error. However, we don't have any credibility issues. I'm afraid I've got a case that goes against your position, the Muniz case. How do you deal with that? Well, I know that the Ninth Circuit in both California Ironworkers and Matthews say that when you're talking about clear legal conclusions, that's a de novo standard of review, and when you're talking about mixed questions of law and fact, that's generally a de novo standard of review. The Doughty case, which is something that Paul Revere relies on, suggests that, well, if there's an essentially factual question, then you review it for clear error. I'm not familiar, Your Honor, off the top of my head, Judge Fletcher, with the Muniz case that you refer to, but I do think the Doughty case, which is a relatively recent case, I think a 2017 case, talks about the fact that if there are essentially factual questions, then clear error is appropriate. Well, the case I'm referring to is Muniz versus AMEC, AMEC Construction Management, written by Judge Clifton. I think it goes against your position. I would say this, Your Honors, the thing that is frustrating about having clear error apply when there is no meaningful ability to make a credibility determination, here, by just reviewing a record, Judge Bryan did the best he could express frustration about trying to evaluate credibility, but you're in a no, he was in no better position than you are. I have to say I'm sympathetic with your argument, but I'm not sure that I can get there from here given our case Well, we would suggest that, you know, as I say, Your Honor, I'm not familiar off the top of my head with Muniz, and I apologize for that. That's something that I should be aware of, but I don't know whether it was an ERISA benefit claim. If it was, then that makes it more applicable, obviously. So if it is abuse of discretion, what's your position? Well, okay, we can deal with an abuse of discretion standard review to a clear standard of review, because when you look at what the analysis of the district court was as to why this individual, Mr. Mikkel, was not entitled to disability benefits, both the IME and the IME reviewer and Paul Revere made a fundamental error here in just looking at one relatively short time frame, a snapshot in terms of the activities of Mr. Mikkel, and then extrapolating it out, projecting it on to whether he could carry out the material duties of any occupation. Well, but when you look at the seven or eight pages in which the judge talked about what his findings were, it doesn't appear to me that he's just looking at a snapshot. He is relying in part on the video, but he's also talking about the medical evidence. He says that ER 50, the medical evidence does not support, I mean, quoting, the medical evidence does not support limitation and restrictions precluding full-time work, and he's looking at the whole record. He's talking about, I have on the bench five large binders in front of me. There was a lot of information, and the frustrating thing on this judgment is that you're looking at an individual who had been on disability for 18 years. He'd been, all those records, all the individuals who had reviewed this claim, including the IME physician, I think Dr. Freesh, I'm not sure I'm pronouncing that name correctly, from back in 2005, that was an IME doctor retained by Paul Revere. He said, yes, Mr. Mikkel is disabled and is not likely, based on the Gain-Bearer symptoms and the CFS, the fibromyalgia, to get back to work. So what's puzzling to us is that you have a relatively short surveillance video that says, you know, he's out on his boat doing things that he acknowledged that he could do. He's been very forthright, Mr. Mikkel, about what he could do and what he couldn't do, and there's quite honestly not much, if anything, in that video that's contrary to what he admits that he was doing on a regular basis. So what is it that justifies, on that video alone, or in the medical records? I mean, you refer to the medical records, Judge Bennett, but the medical records form the basis for Paul Revere to pay benefits to him for 18 years, and there's nothing in there that really changed in a significant way. The IME concludes that there is work that he can do and that he's not disabled within the terms of the policy, doesn't it? Well, yes, that's what the IME conclusion was, but I would purport, we would suggest to you that the analysis was flawed for this reason. The IME doesn't talk about the disabling condition. This is something that Paul Revere acknowledges. They sent a letter to the IME doctor and they said, Mr. Mikkel has long-standing pain and fatigue that is worsened by physical, by work activity. Now that's something that is a disabling condition. It's not that he can't get up and move around. It's that he can't do it on a sustained basis over a 40-hour workweek. And the problem that we have, and the abuse of discretion here, is that Paul Revere never made meaningful efforts to evaluate whether Mr. Mikkel could in fact carry out a workweek activity of 40 hours. They look at a snapshot, a relatively short time frame, they don't look, I don't care what job it is, we can deal with any occupation in the country for which Mr. Mikkel is qualified by education, training, and experience. You got to show up to work. You got to be able to do your job competently. There's no effort made by Paul Revere that's reflected in the record to carry out any analysis on that. They're hanging their hat on two things. The surveillance video and the IME. And the IME, acknowledge, goes through a lot of medical records, but there's no effort to evaluate the extent to which this post-exertional fatigue and pain that Mr. Mikkel undisputedly has dealt with for 18 years is going to allow him to show up to work on a 40-hour a week basis. That's the problem. And we've got a lot of case law that we cite that, from the Ninth Circuit and elsewhere, that talks about the limitations of that kind of surveillance video and being relied on so heavily and improperly by an insurance company in cutting off benefits. In other words, you've got to do more than that. That's the main, that may be the first step in a skeptical insurance company who's concerned about whether an individual should stay on claim. But you've got to do a lot more before you can get to a point, if you're Paul Revere, of saying you are qualified by education, training, and experience to do any occupation because we know you can show up for work 40 hours a week. They don't have that in the record. There's nothing in the record that addresses that. Let me ask you a question that it's not really clear to me from the record, and maybe I'm supposed to take it from the record. He claims that he is, his disability is not based on a somatoform disorder. Right. But. That was the original, that was the Social Security disability. Right. Yes. And he did receive it for that. But there is a mixture here, isn't there? You bet. The pain, so he is adamant that it's not a somatoform disorder. What is it? Well, that's hard to know. Etiology of this has been something that people have been struggling to pin down for a long time, and not just with symptoms. Initially, it was the Ginbear syndrome, and then chronic fatigue syndrome was something that was identified as a disabling condition along with fibromyalgia. The Ninth Circuit in the Orkowski case and the Solomon case has said, look, those things aren't subject to being identified with objective testing criteria, or, you know, you can't take an x-ray, for example, and find this stuff. And that in and of itself, the fact that you can't find an in and of itself a basis to deny a claim. There are other types of quasi, if not purely objective analysis, and that is, you've got individuals who have treated Mr. Mikkel for, as I said, Judge Silver, 18 years. And they're consistent in saying he's disabled. He manifests fatigue. They can see it in his face, or they can see it sometimes in how he behaves in front of them, or they can do what testing they can to try and pin this down. But it is, you're right, a My point, our point, is that there was very little effort by Paul Revere to analyze, number one, the post-exertional aspect of this. So you got 37 minutes on a boat on a afternoon, a nice afternoon. We know that Paul Revere was doing a lot of surveillance of this individual. There's no surveillance for the next day or the two or three or four days after. Were they surveilling him and he never came out of his house? We don't know. Very possible. Let me ask you this, then. Judge Bryan said, and it is absolutely correct to read his opinion as being that he was troubled, he was having trouble with it, and he made this decision in front of everyone. It wasn't written. But then he realized, why couldn't he rely on the video and make that decision? I think he can certainly rely on the video for what the capacity of Mr. Mikkel was at the time he was being videoed. Well, and then your client had the burden of proof, so why not? Well, but the burden of proof, here's the problem. You have the 18 years of records showing that he couldn't show up and do his job on a 40-hour workweek basis. And the only thing that that surveillance goes to is what was going on that afternoon, period, end of story. There's nothing in the surveillance that provides any basis for the IME physician to draw any conclusions, or Paul Revere, for that matter, to draw any logical or reasonable or rational conclusions about how Todd Mikkel was doing the next day, or three days later. We don't know the answer to that question, other than through Paul, or rather through Todd Mikkel's own reports and through the medical records going back the 18 years. Didn't the judge say at ER 48, with regard to the video, the surveillance video casts some doubts on the claims of plaintiffs of disabling pain, and isn't that a reasonable finding for the judge to make, and certainly not clear error based on the video, which I presume we've all looked at? Yes, I agree with you, Judge Bennett. I looked at the video and thought, it certainly doesn't look disabling to me. That's not the analysis, though. But it's not irrelevant. It's relevant, I agree with you, but it's not, it's arbitrary and capricious for that snapshot alone, without some additional analysis of the post-exertional fatigue and pain, and whether he could show up for work 40 hours a week, to terminate his benefits on that alone. So, and with that, I'll reserve. Yeah, let's hear from the other side, and then you'll save some time. May it please the court, my name is Michael Riley with my co-counsel, Perry Jansen. We are asking that the court affirm Judge Bryan's decision. We do believe this is a clearly erroneous standard case. The Muniz case is very close to this case. In Muniz, both sides agreed that the court could look at the record under de novo review. That's exactly what we did here. And then the court had a Rule 52 motion, and in Muniz, they actually said exactly what the court has said here, that the clearly erroneous standard should apply. So, if that's true, the issue for the court is whether, under the full record, whether Judge Bryan's analysis presents a plausible justification for the decision he made, and we believe that's true. In a case like this, fibromyalgia, gluing . . . You may or may not know the answer to this question. We just heard an assertion that your client did quite a bit of surveillance beyond what we have in the record with respect to the sailing video, I'll call it that. Is that true? That's not true. That's not in the record either. I think the full surveillance that was occurred is in the record specifically, and I think it's over a period of three days. But specifically, the surveillance on the He said, well, where is the review that you would submit that he was feeling terribly the day after the sailboat, that he was not active the day after? And we asked the court to look at the record at 2-13. He submits a seven-page declaration. He actually tries to take on the surveillance, saying the surveillance isn't exactly accurate. But there's something surprising that is not said there, and that is, the next day I was washed out, I couldn't do anything. It's just not there. And I think this comes back to the whole issue in a case, fibromyalgia, Ghoulain-Barr, whatever it is, credibility is pretty important because it's a self-report. It's true, there's no objective test that establishes fibromyalgia, Ghoulain-Barr, and those types of things. That's okay. That's not what we're asking for. We are asking for objective evidence of disabling pain. And so, and... Go ahead. But the one question you raised is also an important question here, and that's the credibility issue. And the judge didn't make a credibility determination. He suffered throughout and said it was a closed question. But what I've been wondering throughout my review of this file is, when did your client finally determine, after the 17 years of his having this disability and a substantial period of time, for when your client decided that he was disabled, when did your client finally determine he is not disabled? He no longer has chronic fatigue syndrome. He no longer has the illnesses that your own witnesses and doctors had originally found him to have. With all due respect, Your Honor, they have never said he doesn't have fibromyalgia or Ghoulain- was, what's the disabling effect? What is the pain? And so, my first answer is, that IME, it's a 24-page IME. It reviews all the doctors. There's over 16 doctors over a 20-year period that Dr. Mohi reviewed. And then he has a 75-minute actual physical exam of this person. Much different information than what Judge Bryan had when he concluded he was disabled back in 2001. I was on that case then. And Judge Bryan ridiculed us fairly, I believe, that we didn't have an IME in that case. So, 17 years later, $1.6 million paid out, $7,500 a month, Dr. Mohi, a board-certified Seattle rheumatologist who Paul Revere has never done any work with before in the past, reviews all that painstakingly. And so, I would say that that's when it came. But here are some key things that go to the Mr. Mikkel took the position during that independent medical exam that he has not had any improvement. That's the record at 169. But the records show much different. So, he took the position that he'd not improved, which means he couldn't drive a car. That's the record at 129. That he had fire-like pain in his muscles, worse with any activity. That's the record at 91. That he had pain 100% of the time. That he couldn't squat or bend. That's the record at 10. That's the position he took with Dr. Mohi. But the medical records, his own doctors showed much different. But chronic fatigue syndrome doesn't require a proof of medical records. And, and, you know, in May of 2017, and after the doctor, his doctor did a, an examination one year before, he said he still had the same illness that he had been treating him for, for I believe it was 10 years as opposed to 17. And that chronic fatigue syndrome, as we know from the Ninth Circuit, makes clear. Objective findings are not required. And I didn't see in the report, and you can tell me where I missed it, where your doctor actually took apart his doctor's report of one year before, where the doctor said, unequivocally, that he was still, he still had the same condition. He did an examination of him. Then your client, in May of that year, came back, an employee of your client, and interviewed him, said, is it still your position? And he said, adamantly, it's still my position that he has chronic fatigue syndrome. So the objective evidence is enough. All right. So maybe I've not explained it correctly, but again, our position has never been that he doesn't have these conditions. The issue is whether he has, where's the objective evidence of disabling pain? We cite to you the Jordan case, and the Jordan case says, in cases like this, what objective evidence do you look for? And they say, you look for muscle weakness, acute distress, whether they can be freely ambulatory. And, and here's what's really important about muscle weakness. When you have disabling pain, and you don't want to move, you end up not using that muscle. And over a period of time, you you get muscle weakness. That's what the Jordan case talks about. But what we know here is that in the independent medical exam, in the Jordan case, I'm sorry, I, the ones I've been looking at for chronic and the Honda long term disability plan case. Well, Jordan case. Yeah, it's 370 F 3880. It's a Ninth Circuit 2004 case. And it's it's really going to the issue of disabled. He's talking about fatigue and pain. That's what he's talking about. And that's what you're looking at then is, is someone not using it? And here's what's great. There was actually a test by one of his doctors, this is the record SCR at 21, where they actually made the conclusion after they did a bunch of testing, that he had no symptoms of reflex sympathetic dystrophy. reflex sympathetic dystrophy is exactly what you would get if you were in a pain situation where you felt like you couldn't use your muscles. When you don't use your muscles, you get atrophy. When you get atrophy, you get muscle weakness. And the key finding in this independent medical exam is that he had no muscle weakness. And no other doctor has found muscle weakness with him. That's what's important. So now I turn it back to the case for Judge Brian, who I've never had this before, actually said in the record, he reviewed this record with a magnifying glass. That's how close he looked at this record. No, Judge Brian's a very careful judge. I got a slightly different question. It's just the meaning of the policy. After the 24 months during which it's his own occupation, it becomes any occupation for which he may become suited by education, training, or experience. I'm trying to figure out what that means. Is it something that he can do? I'll take as my example, when we see social security cases constantly, and usually when they're going to deny benefits, they say he can be or she can be a small parts assembler. I have no idea what that is. But that's always why they deny benefits. That's an unskilled job. He's obviously got some skills. He was CEO of some kind of a computer company up in, I think it was in Bellevue for a time, before he got the shot that disabled him. Does suited by education, training, and experience exclude him from being an unskilled manual laborer, like small parts assembler sitting in a chair? Or does it mean, does it mean that he has to do something that's, as it were, suited to his experience and educational class? What's, what's, just what's it mean? It's any occupation. It doesn't have to be tied to that. First, the... Your position is that small parts assembler or cashier at a 7-Eleven, if he can do that... That would be in any occupation. We actually cite to the Ritchie case, 608 F sub 2nd, 1311. It's a Florida case, 2009 case. Similar issue, though, where you're looking at, can he do his own occupation? His own occupation was sedentary. The other side didn't disagree with that. His, his occupation was sedentary. That was not disputed below, correct? Correct. And, and Judge Bryant found that the question, I think ER 49, was can he perform sedentary work, either using as a guide his former owner-manager occupation, or any occupation in the policy? Correct. And your view is that that's a correct reading of the policy? That's correct, yes. But what I'm trying to figure out is, is it really low skill, low stress, totally tedious occupations that he would never in his world, in the world, want to take because he's much more educated than that? You're saying that the policy says if he can do those... I'm just trying to figure out what the policy is. Yeah, as to skill sets, that's right. Okay. That's correct. So, so I'm wondering about that too. I was confused about whether or not this really is different than Social Security, because you have, you have experts that make a determination as to whether or not somebody can do sedentary work. And it's your position that you read the policy as you would for Social Security, as if you can do anything? Well, that's, I'm using the policy. Okay. I'm just going with the policy. So, was that the decision that was made then in 2005, when they, when Dr. Fricci, I think, found him disabled? That, at that time, he said he could not do any sedentary work? They concluded he had met the definitions of the total disability under the policy. That's true. So, it's been consistent throughout then, even way back in 2005? I think that would not be a consistent ruling. There has been a statement, because UNAM, Paul Revere, did challenge it in 2001, and said, we don't think he's totally disabled. And that's when Judge Bryan looked at the record, said, it's kind of a close call, but in the end, you should have had an independent medical examination. And that's what we did. But then in 2005, you did. We did. And your, your examiner said that he has chronic fatigue syndrome. There's no question. There's no question. So, he didn't really focus on the very issue, I think, I'm asking right now, is whether or not you read this as if he was incapable of doing sedentary work. So, I see them as being inconsistent. That your position today is that, that all your client had to do is make a determination that he couldn't do sedentary work. But I don't see that as being the decision that was made by your independent medical examiner in 2005. Well, we disagree, Your Honor. The IME does actually show that. But let's, let's put it aside a second. What do the records show? The records show improvement. Dr. Minotti, in a record at 69, his doctor says he's had improved conditions. He doesn't have any more symptoms related to Ghoulain-Barr. That's the record at 69. Dr. Mohi says when he did an exam and he palpated him, he did not sense that there was any response or pain. So the exams actually show it. He had no functional limitations during the exam. He had full range of motion and all that. So, and then I guess I have to finish with the video, with all due respect. Because this video is not intended to show everything. It's just, getting back to Judge Bennett's comment, that it does affect credibility, when you have such an important credibility. And there's about eight things in that video you should look at that aren't consistent. And when they're not consistent, I think the judge can look at it and say, gosh, looking at the video. I have to say, I don't view what happened, what we saw in the video, as going to credibility in any important sense. Because he has said very openly and always, listen, I go sailing on Wednesdays. And I got my own boat and I move around and I do stuff, the heavy stuff. Maybe I have my friends do, but he's doing exactly what he said he'd do. Now, it turns out, that if you look at it, he's doing it without apparent difficulty. But he was very forthright that he was, that this was an activity that engaged in. It's not as though you caught some guy who claimed to be totally disabled out golfing three times a week. I mean, those are slam dunks for you. But he's doing what he said he was doing. Your Honor, I'll present a different view. The record at 137. He said, he told the doctor and told Paul Revere, he does not pilot the boat. He does not sail it. He does other tasks. That's the record. This video shows he did. Number two, he says he'll sail for a maximum of two hours. Well, that's not true either. He actually sailed for a maximum of five that day. He says he can't squat or bend. That's the record at SER 10. But on that boat, he was squatting or bending. He says he can't continually stand. That's at 135 of the record. But on that, he stands quite a bit. He says that he is fatigued after a few minutes and must stop his activities. That's the record at 129 and 187. That's not what you see in that video. So we believe there is at least six to eight inconsistencies that at least substantiate that what they're being told isn't exactly what the record is. And with that, we ask you to affirm. Your timing is perfect. Thank you. Again, the video is maybe a starting point. The video, we all looked at the video. And I looked at the video and thought, that looks so suspicious. I'd like to respond to what we just heard in the last couple of minutes. That is to say, if credibility really is important here, which it is in all of these fibromyalgia, chronic fatigue, because the physical symptoms really don't tell you very much. How do you deal with the inconsistencies? We were told, he was very forthright, that he goes sailing on Wednesdays if the weather's not too bad. But the activity, the precise activities he's doing are more than what he told the doctor he could do. I think that you can make that point. And Mr. Riley is a skilled advocate. He knows his job and he does it well. I understand that the point was just made. And how do you respond? My response is that it's not that difficult to nitpick some things that say, hey, that's a credibility issue, because there's some inconsistency. We're much more in your camp in this, Judge Fletcher, in the sense that... No, I'm not sure what camp I'm in. Well, your comments... But what I'm getting at is it appears that, when he's talking to the doctor, he's exaggerating. Well, I think that characterizations are subject to, they're not hard and fast, black and white things. Words... You have the burden of proof. That's true. And I think that our credibility, when you talk about credibility, Todd Mickle could have said, I'm laid up all the time. He didn't. He was forthright in explaining what he did. Two to three times a month I go sailing. And that's what he did. Now, you can nitpick about, well, he said 10 or 15 years ago on a medical record, he said he doesn't stoop or kneel because it's too painful. And he was doing that. Come on. I mean, if you go through 20 years of medical records or 15 years of medical records, you're going to be able to find some discrepancies or things that aren't consistent from time to time. I don't think that's a fair question about credibility. But our point is more, when you talk about the standard of review, that's what... I mean, if it's a credibility issue and if it's clear error, we lose. Period. End of story. That's the problem here. We don't lose because the process by which they used the video to, in and of itself, without much else at all, use that as the basis for termination was a flawed process. That was arbitrary and capricious. Why? Because it was a snapshot. You've got to look at the post-exertional pain and fatigue. You've got to evaluate. You've got to do something to evaluate whether Mr. Mikkel can show up to work for 40 hours a week. That was where Paul Revere dropped the ball. They never got to that. And until you get to a point where you have some information in the record that justifies Paul Revere's termination because they took the next step, they went beyond that first step of, hey, this video raises some concern. Okay, fine. Go out and get additional information about whether you qualify for any occupation. And I want to address your question, Judge Fletcher, this question about education, training, and experience. That language in this policy means something. What you heard Paul Revere say is it really doesn't mean anything. If he can do anything at all in any occupation, that's not a fair reading of the language of the policy. A fair reading of the language of the policy says when you talk about by education, training, and experience, you're limiting the scope of activities and jobs and occupations that you have to be able to do in order to disqualify yourself from benefits. Is that in your brief, counsel? Well, no, because I don't think we, that wasn't something that was raised in the brief by either side. But I think that that's an argument based on the plain language. But you're saying it's in the record because that, it's in the record? Well, I'm saying that a plain, a reading of the plain language of the policy, if you read it the way Paul Revere is asking you to, you are, you're ignoring explicit language that limits the exclusion or limits the ability to limit those benefits in a way that's unfair. Well, counsel, what the judge found at 49 is that the plaintiff can now perform sedentary work, either using as a guide his former occupation or any occupation in the policy, and you haven't taken issue with that reading of the policy on appeal, correct? Certainly the language of the policy requires that we demonstrate that he is not able to perform any occupation for which he's reasonably suited by education, training, and experience. Which would clearly include sedentary work. I mean, that's what you did before. Well, the sedentary work is just one aspect of any occupation. There's the other things that are brought to bear for doing the job. Okay. Thank you. Thank both sides for their arguments. Mikkel v. Unum Group now submitted for decision.
judges: W. Fletcher, Bennett, Silver